# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-3903, 03-1091, 03-1425, 03-1517 & 03-1899

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

BOBBY SUGGS, SEANTAI SUGGS, AARON M. DAVIS,
BOBBY DAVIS, and BENJAMIN JOHNSON,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 01 CR 98—**James T. Moody**, *Judge.*

———————

ARGUED FEBRUARY 23, 2004—DECIDED JULY 2, 2004

———————

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* On July 20, 2001, a federal grand jury returned a thirty-three count superceding indictment against eighteen defendants, including all five of the Appellants in this consolidated appeal. Three of the Appellants—Bobby Suggs, Seantai Suggs, and Aaron Davis—were convicted by a jury of conspiracy to possess with intent to distribute more than fifty grams of cocaine base ("crack") in violation of 21 U.S.C. § 846, along with a variety of other drug charges pursuant to 21 U.S.C. §§ 841

and 843. These Defendants seek reversal of their convictions on the grounds that the district court admitted unfairly prejudicial evidence, such as photographs of Bobby Suggs's and Seantai Suggs's tattoos and Aaron Davis's gold front tooth, offered to show that they were affiliated with a street gang. Seantai Suggs and Aaron Davis also challenge the sufficiency of the evidence presented by the government on the conspiracy count. For the reasons stated herein, we affirm the convictions of Bobby Suggs, Seantai Suggs, and Aaron Davis.

Benjamin Johnson and Bobby Davis each pled guilty to one count of distributing cocaine base in violation of 21 U.S.C. § 841(a)(1). Both men waived the right to appeal in their respective plea agreements, but now seek to withdraw their guilty pleas. We uphold the appeal waivers and sentences of Johnson and Bobby Davis.

## I.  History

### A.  The Trial

At the trial of Bobby Suggs, Seantai Suggs, and Aaron Davis, the government sought to prove that the three men were involved in a criminal conspiracy to distribute crack in the Concord neighborhood of Gary, Indiana. The conspiracy began in 1994 and ended in 2001; individuals, including the three Defendants, participated at various times and to varying degrees during the course of the conspiracy. The drug trafficking occurred at a government housing complex, just west of Burr Street and south of 15th Avenue (known as "the hill" or "the hole") and on 19th Place, a dead-end street also known as Court Street. Although not involved at the beginning, Bobby eventually led the conspiracy, obtaining kilogram quantities of powder cocaine from multiple sources. He and other co-conspirators converted the powder into crack cocaine. Bobby then distributed the crack to trusted associates, including his brother, Seantai, and

Aaron Davis. They, in turn, sold some crack directly to customers and distributed the rest to other dealers, such as Benjamin Johnson and Bobby Davis.

The government's case was based primarily on testimony, videotaped drug transactions, recorded phone conversations, and the presence of drug paraphernalia in Seantai's apartment recovered pursuant to search warrants. Testimony came from members of the Gary Police Force and an FBI-led task force focused on drug and violent crime in northwest Indiana, confidential informants, and members of the drug conspiracy who chose to cooperate with the prosecution.

To help establish the conspiracy, the government also sought to prove that the members of the drug conspiracy were members of a street gang, known as Concord Affiliated (or CCA), that was associated with the Vice Lords, a gang that originated in Chicago but has branched out across the Midwest. The Defendants denied involvement with the drug trade and insisted that CCA was only a rap group, not a gang.[1]

Several witnesses established that Bobby received large amounts of cocaine during the course of the alleged conspiracy. Robert Evans, one of Bobby's suppliers, testified that he had supplied Bobby with multiple kilograms of

---

[1] CCA was indeed a rap group. One of their compact discs, entitled "One Life 2 Live," was entered into evidence. Furthermore, the group has appeared on the Billboard list of top-selling albums and has received high ratings from industry magazines. Aaron Davis was the most prominent musician in the group. Seantai Suggs was a guest performer and also participated in a related rap group that was under the CCA umbrella. Bobby Suggs promoted CCA in Gary and nationally. The government's expert witness on gangs testified that he was familiar with gangs using the proceeds of drug trafficking to start legitimate businesses, including rap groups.

powder cocaine. He personally delivered one kilogram to Bobby's Concord apartment on a single occasion in 1997; both Bobby and Seantai were present when he made the delivery. Other drug suppliers, Anthony Evans (Robert Evans's brother who succeeded Robert after Robert went to jail) and Tomas Unzueta, confirmed that Bobby purchased large amounts of cocaine. Unzueta sold multiple-kilogram quantities to Anthony Evans, who purchased the drugs from Unzueta using funds from Bobby. After a dispute between Anthony Evans and Unzueta, Unzueta dealt directly with Bobby. Unzueta testified that he delivered six more kilograms of cocaine to Bobby after the Evans brothers were no longer used as middlemen.

Bobby converted the powder cocaine to crack at several residences in the Concord neighborhood, including Seantai's residence. Stacey Brookshire, a Gary drug dealer, testified that he observed Bobby cooking approximately one-half kilogram or more in Bobby's apartment. He also helped Bobby prepare nine ounces at a residence on 19th Place. A co-conspirator, Previn Starns, testified that he saw Bobby cooking approximately one-eighth kilogram at a co-conspirator's residence on 18th Avenue.

Other drug dealers involved in the conspiracy pled guilty and agreed to cooperate; they linked all three trial Defendants to the conspiracy. Michael Carter testified that Bobby Suggs and Aaron Davis supplied him with drugs. When Carter was arrested, Seantai Suggs told him to lie about his involvement with the drug conspiracy and to claim that he was merely a fan of the CCA rap group. William Carter testified that he had received drugs from all three men; on at least one occasion, Bobby Suggs provided him with drugs without immediate payment. Stacey Brookshire confirmed that Bobby, Seantai, and Aaron sold crack.

A plethora of evidence was presented to establish that members of the conspiracy sold crack in Concord. An FBI

informant moved into the neighborhood in February of 2000 and purchased drugs in nineteen separate transactions from ten different drug dealers, all of which were video-taped. Although she did not buy any drugs directly from the three trial Defendants, she testified that the drug dealers became much more organized when Bobby was outside observing their conduct. Using other paid informants from the neighborhood, the FBI also made controlled buys of crack from Seantai and Aaron Davis. The agents searched the informants, supplied them with money, sent them to complete the transactions, and recovered the purchased crack.

The FBI also recovered incriminating evidence during searches conducted at local residences. A search of Seantai Suggs's apartment led to the recovery of a large glass Pyrex beaker, a box of baking soda, a box of sandwich baggies, a .40-caliber handgun, small quantities of crack cocaine, United States currency, a digital scale, and a knife with crack residue on it. DEA Special Agent Eric Lee opined at trial that these items were consistent with the cooking and packaging of crack. While in jail, the authorities taped phone calls made by Seantai to Bobby and others. Seantai told the men that the "fat rock," a term commonly used to refer to a large amount of crack, according to Agent Lee's testimony, was at "Ms. Howard's" house. The FBI later searched the residence of "Ms. Howard," and they discovered a drug ledger that accounts for a kilogram of drugs.

The Defendants' own statements were also used against them to establish their involvement in drug trafficking. Arrested shortly after the search of his apartment, Seantai told FBI agents that he needed a gun because of his association with CCA and that "CCA don't take shit from no one." Further, the FBI intercepted a number of Bobby's telephone communications. On many of the tapes, Bobby is being informed by other members of the conspiracy of police presence in the area. On occasion, he would issue the order

to "lay low." Lastly, Aaron Davis was one of the performers in the CCA rap group. The government pointed to the song, "COKE," in which Aaron raps about his extensive involvement in the drug trade, and his appearance in a video entitled "Live or Die in GI," in which he states that the subjects about which he raps are real.

As part of proving the conspiracy, the government submitted evidence of gang affiliation. After an extended period of gang violence in Gary, Bobby brokered a peace deal with a rival gang, the Bronx Boys. Other members of CCA, purportedly acting on orders from Bobby, committed a violent reprisal against a local citizen who had called the police about drug activity in the neighborhood. Michael Carter, one of the conspiracy's cooperating witnesses, testified that Aaron Davis was a Vice Lord. A letter to Aaron Davis, seized at his Indianapolis apartment, addressed Aaron as "Lord," a term used to refer to members of the Vice Lords. Bobby, talking to a federal agent before the indictment, explained that although gang affiliation was based on neighborhood in Gary, if he were to go to jail he would align himself with the Vice Lords. Finally, Vice Lord literature, including oaths and a constitution, were recovered from the home of Bobby's and Seantai's parents.

Other gang evidence consisted of expert testimony and photographs depicting the Defendants' physical characteristics and gestures. Bobby has a tattoo on his left arm of a cross with the word "Insane" written above the cross. Chicago Police Sergeant Robert Grapenthien testified that the Almighty Vice Lord Nation has broken into five factions, one of which is the Insane Vice Lords. Seantai has a tattoo of a crescent moon and a five-point star on the left side of his chest. Grapenthien testified that the five-point star and the crescent are some of the identifying symbols of the Vice Lords. Aaron Davis does not have any tattoos, but he does have a five-point star carved into a gold cap on a front tooth. In addition, several photographs were admitted

into evidence that depicted numerous members of the conspiracy using hand signs and wearing jewelry that indicates Vice Lord affiliation, according to Grapenthien.

All three men were convicted by the jury of the drug conspiracy count and other counts. The district court sentenced Bobby Suggs and Seantai Suggs to life in prison; Aaron Davis received a 405-month sentence. As mentioned previously, all three men challenge the use of evidence linking them to the Vice Lords street gang. Seantai Suggs and Aaron Davis challenge the sufficiency of evidence to sustain their conspiracy convictions.

## B.  Plea Bargains

### 1.  Benjamin Johnson

On June 26, 2000, Benjamin Johnson distributed crack to a confidential informant in Gary. The controlled buy was videotaped. Johnson was indicted along with the other members of the alleged CCA conspiracy. After the trial and conviction of the Suggs brothers and Aaron Davis, Johnson decided to plead guilty to Count 7 of the superceding indictment, distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1).

The district court, in accordance with Federal Rule of Criminal Procedure 11, conducted a change of plea hearing on January 14, 2003. Johnson affirmed at this hearing that he wished to plead guilty to Count 7. The district judge subsequently questioned Johnson. The district judge made all of the required Rule 11 inquiries. Importantly, Johnson acknowledged that he understood that even though the other counts against him would be dismissed, those counts could still be used as relevant conduct under the United States Sentencing Guidelines. Johnson also agreed that his right to appeal was a very important right, but he was nonetheless waiving it with respect to his sentence. The

district court then accepted Johnson's guilty plea and adjudged Johnson guilty of Count 7.

Before Johnson's sentencing hearing, he filed a pro se motion to withdraw his guilty plea. Even though everything at the plea hearing indicated that his plea was voluntary, Johnson insisted that he had been coerced into pleading guilty by the government and that he did not understand that he could be sentenced for relevant conduct under the other counts of the indictment. On March 28, 2003, before holding the sentencing hearing, the district judge considered Rule 11(d)(2)(B), under which a guilty plea may be withdrawn for just and fair reasons, but found that it was neither fair nor just to allow Johnson to withdraw his guilty plea.

The district judge then conducted the sentencing hearing. He found Johnson to have been involved with over 1.5 kilograms of crack during a span of five years and imposed a two-level enhancement for the use of weapons. The district court also refused to grant a reduction for acceptance of responsibility. Johnson's guideline range was 292 to 365 months, but the district judge sentenced Johnson to 240 months, the maximum sentence under his count of conviction. Johnson appealed, claiming that the district court should have held an evidentiary hearing on his motion to withdraw his guilty plea and that the district court should have allowed him a reduction for acceptance of responsibility under the Guidelines.

**2.   Bobby Davis**

On September 26, 2000, Bobby Davis distributed crack to a confidential informant in Gary. The controlled buy was videotaped. Johnson was indicted along with the other members of the alleged CCA conspiracy. On May 1, 2002, Bobby Davis pled guilty to Count 10 of the July 20, 2001 indictment, distribution of crack cocaine in violation of 21

U.S.C. § 841(a)(1). In exchange for the guilty plea, the government dismissed the other three counts in the indictment pertaining to Davis.

Prior to accepting Davis's guilty plea, the district judge, in accordance with Federal Rule of Criminal Procedure 11, addressed Davis personally to ensure that Davis's plea was knowing and voluntary. Davis affirmed at this hearing that he wished to plead guilty to Count 10. The district judge made all of the required Rule 11 inquiries. Like Johnson, Davis acknowledged that he understood that even though the other counts against him would be dismissed, those counts could still be used as relevant conduct under the United States Sentencing Guidelines. Davis also agreed that his right to appeal was a very important right, but he was nonetheless waiving the right to appeal his sentence. The district court then accepted Davis's guilty plea and adjudged him guilty of Count 10.

On February 11, 2003, the district court held a sentencing hearing. The district judge found Davis to have been involved with over 1.5 kilograms of crack during a span of five years and imposed a two-level enhancement for the use of weapons. The district court also refused to grant a reduction for acceptance of responsibility. Davis's sentencing range was 292 months to 365 months, but the district judge sentenced Davis to 240 months, the maximum sentence under his count of conviction. Despite his waiver of appeal, Davis seeks to appeal on the grounds that his plea agreement was not knowing and voluntary. But his attorney, proceeding under *Anders v. California*, 386 U.S. 738 (1967), submits that there is no non-frivolous issue for appeal.

## II.  Analysis

### A.  The Admission of Gang Affiliation Evidence

Bobby Suggs, Seantai Suggs, and Aaron Davis make three evidentiary claims. First, they assert that it was improper to admit any evidence of gang affiliation because such evidence is not directly probative of participation in the drug distribution conspiracy, and it tends to unfairly prejudice the jury based on a status—gang membership—that is not itself a crime. Second, the Defendants contend that particular exhibits entered into evidence—photographs of Bobby and Seantai Suggs's tattoos and Aaron Davis's gold tooth—were especially prejudicial and, even assuming it is proper to admit evidence of street gang affiliation, this particular evidence lacked probative value in linking the trio to the Vice Lords street gang. And finally, the Defendants argue that the district judge should have delivered a limiting instruction to the jury on the use of the gang-affiliation evidence, despite the fact that such an instruction was not requested at trial.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Yet, where the probative value of relevant evidence is "substantially outweighed by the danger of unfair prejudice," it may be excluded. Fed. R. Evid. 403; *see also United States v. Pulido*, 69 F.3d 192, 201 (7th Cir. 1995). Because we have acknowledged that most relevant evidence, by its very nature, is prejudicial, only *unfairly* prejudicial evidence *must* be excluded. *Pulido*, 69 F.3d at 201. "Evidence is unfairly prejudicial only if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *Id.* (quotations omitted).

"We give special deference to a trial judge's evidentiary rulings 'because of the trial judge's first-hand exposure to

the witnesses and the evidence as a whole, and because of the judge's familiarity with the case and ability to gauge the impact of the evidence in the context of the entire proceeding.'" *United States v. Hernandez*, 330 F.3d 964, 969 (7th Cir. 2003), *cert. denied* 124 S. Ct. 1599 (2004) (quoting *United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998)). Only where the district court has clearly abused its discretion, meaning that "no reasonable person could take the view adopted by the trial court," will we reverse an evidentiary ruling. *Id.* (quotation omitted).

### 1.   General Evidence of Gang Affiliation

Despite its highly prejudicial nature, it is well settled in the Seventh Circuit that "[e]vidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997). "Gang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue[,]" such as in a conspiracy case. *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) (affirming district court's ruling allowing gang evidence because that evidence "helped demonstrate the existence of the conspiracy and the connections between members of the conspiracy"); *see also United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996) ("[G]ang membership can be key to establishing criminal intent or agreement to conspire.").

Here, the district court correctly admitted evidence of the Defendants' gang affiliation "for the [limited] purpose of demonstrating the existence of a conspiracy to distribute illegal drugs, and the connections between members of CCA and the conspiracy." (Trial Tr. I, 36). The government did not mislead the jury by improperly substituting evidence of gang affiliation for evidence of involvement in the drug

conspiracy. Instead, the government used gang affiliation as probative circumstantial support for their theory of the case: that the indicted individuals had engaged in a conspiracy to distribute crack. Further, evidence of Vice Lords affiliation tends to disprove the defense theory that CCA was merely a rap group. Showing that CCA was a gang with links to the Vice Lords was not unfairly prejudicial; the district court was within its discretion in deciding that this evidence was significant in showing the cohesiveness of the drug trade in the Concord neighborhood.

### 2. Tattoo Evidence Used to Establish Gang Affiliation

The specific exhibits showing Bobby and Seantai Suggs's tattoos and Aaron Davis's gold tooth did not violate Federal Rule of Evidence 403. As established above, gang membership is relevant evidence in showing a drug distribution conspiracy. Tattoos that help to establish gang membership are admissible to support a showing of a joint venture or conspiracy. *See United States v. Lewis*, 910 F.2d 1367, 1372 (7th Cir. 1990). Our cases holding tattoo evidence to have been inappropriately admitted are factually inapposite because they did not involve criminal conspiracies. *See United States v. Thomas*, 321 F.3d 627, 630-33 (7th Cir. 2003) (vacating a conviction, in part because the admission of a photo of a gun tattoo could only have been intended as propensity evidence in the defendant's conviction for possession of firearms by a felon); *United States v. Irvin*, 87 F.3d 860, 864-66 (7th Cir. 1996) (balancing the low probative value of gang-membership tattoo evidence in proving non-conspiracy drug charges and the high prejudicial value of tattoos and motorcycle gang affiliation in finding error in the trial court's admission of the evidence).

Here, the trial judge was within his discretion in allowing the jury to view these exhibits. Certainly, the presence of

tattoos or gold teeth could be used purely as an unfairly prejudicial emotional appeal to the jury. But in the instant case, the government presented evidence that linked drug distribution in the Concord neighborhood to membership in CCA, a gang with links to the Vice Lords. The jury could consider common gang affiliation as circumstantial support for the existence of a conspiracy (as opposed to unconnected drug transactions). Moreover, the Defendants refused to stipulate to the fact that they were gang members, instead insisting they were only connected by their participation in and promotion of a rap group. In this context, it is unconvincing to argue that the government should have been limited to only the least prejudicial evidence of gang affiliation.

### 3.   Limiting Instructions

Finally, with regard to the Appellants' complaint that the district court gave no limiting instruction to the jury on the use of the gang-affiliation evidence, we find no error. The Defendants did not request any limiting instruction. By not requesting such instruction, they have forfeited the argument. *See, e.g., United States v. Olano*, 507 U.S. 725, 733 (1993). And the district court did not commit plain error in deciding not to sua sponte provide a limiting instruction—it is very possible that the Defendants' lack of a request for such an instruction was a tactical decision to avoid emphasizing gang membership. *See United States v. McKinney*, 954 F.2d 471, 479 (7th Cir. 1992) ("[Defendant] did not ask for a limiting instruction at trial so he cannot now complain about the lack of such an instruction.").

### B.   The Sufficiency of the Evidence

At least for the purposes of this appeal, Seantai Suggs and Aaron Davis do not deny that they were crack dealers.

They do deny that they were engaged in a conspiracy with Bobby Suggs and others to distribute crack, arguing, rather, that the government demonstrated, at most, a buyer-seller relationship between Bobby and themselves.

The standard of review facing the Defendants on their claim that the jury had insufficient evidence to convict is a daunting one. *See United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003); *United States v. Sanchez*, 251 F.3d 598, 601 (7th Cir. 2001) (calling a sufficiency of the evidence challenge an "uphill battle"). Considering the great deference owed to the jury's verdict, we will view all the evidence and draw all reasonable inferences in the light most favorable to the prosecution and uphold the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001); *see also Sanchez*, 251 F.3d at 601.

To prove the conspiracy charge under 21 U.S.C. § 846 against each Defendant, the government was required to show an agreement between two or more people to possess and distribute the crack, and that Seantai and Aaron joined this agreement knowingly and intentionally. *See Gardner*, 238 F.3d at 879. The agreement must amount to more than just the sale of the drugs themselves. *Curtis*, 324 F.3d at 505. Rather, the government needs to demonstrate "an understanding—explicit or implicit—among co-conspirators to work together to commit the offense." *Id.* If the prosecution succeeds in establishing a conspiratorial agreement under the first element of the offense, it must then show that the Defendants knew about the conspiracy and chose to associate with the "criminal scheme." *Id.* (quotations omitted).

## 1.   The Conspiratorial Agreement

To distinguish between a buyer-seller relationship and a conspiratorial agreement, we look for evidence of a pro-

longed and actively pursued course of sales, coupled with the defendants' knowledge of and shared stake in the illegal venture. *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001). Factors considered in determining whether the association at issue amounts to a conspiracy include whether there was prolonged cooperation between the parties, a level of mutual trust, standardized dealings, sales on credit (or "fronting"), and the quantity of drugs involved. *Sanchez*, 251 F.3d at 602; *Contreras*, 249 F.3d at 599. "Although none of these factors is dispositive, if enough are present and point to a concrete, interlocking interest beyond individual buy-sell transactions, we will not disturb the factfinder's inference that at some point, the buyer-seller relationship developed into a cooperative venture." *Contreras*, 249 F.3d at 599.

The Defendants' relationships had ample indicia of a "cooperative venture" to support the jury's verdict. A long-term pattern of distribution developed in Concord. Only those sanctioned by the CCA gang were able to distribute in that area. Testimony established that Bobby Suggs obtained large quantities of cocaine and, with the help of other members of the conspiracy, converted the powder cocaine to crack and distributed the crack to street-level dealers. Members of the conspiracy monitored the presence of police and engaged in violent activities to continue their profitable business. The evidence supports the conclusion that this was a consistent, long-term distribution conspiracy.

### 2. Seantai Suggs and Aaron Davis Joined the Conspiracy

Ample evidence linked Seantai Suggs to this drug conspiracy. Seantai's residence was used for making crack, as evidenced by Kenneth Lewis's testimony and the physical evidence recovered during the FBI search of the residence. The Suggs brothers engaged in a telephone conversation about the location of the "fat rock" when Seantai had been

arrested. Furthermore, Stacey Brookshire testified that Bobby gave Seantai crack for resale.

There was also sufficient evidence in the record to link Aaron Davis to the conspiracy. He supplied numerous dealers, including William Carter, with drugs. Kenneth Lewis and Stacey Brookshire testified that Bobby Suggs supplied Aaron with crack. Both Seantai and Aaron sold crack to FBI informants in controlled buys. Both also had links to CCA and the Vice Lords.

The close working relationship among the Suggs brothers and Aaron Davis shows a level of mutual trust and effort towards common goals that belies the contention that mere buyer-seller relationships existed. Based on the abundant evidence presented at trial, a rational trier of fact could have found the Defendants guilty beyond a reasonable doubt of conspiring with intent to distribute crack. We will not disturb the jury's verdict.

## C.  Plea Agreement Appeal Waivers

A defendant may waive his appeal rights as part of a plea agreement, provided the waiver is clear and unambiguous. *United States v. Mason*, 343 F.3d 893, 893-94 (7th Cir. 2003); *United States v. Nave*, 302 F.3d 719, 720 (7th Cir. 2002); *United States v. Woolley*, 123 F.3d 627, 631-32 (7th Cir. 1997). "[T]he right to appeal is a statutory right, and like other rights—even constitutional rights—which a defendant may waive, it can be waived in a plea agreement." *United States v. Feichtinger*, 105 F.3d 1188, 1190 (7th Cir. 1997). Voluntariness of a guilty plea is ensured by a court's compliance with Federal Rule of Criminal Procedure 11. *United States v. Schuh*, 289 F.3d 968, 975 (7th Cir. 2002).

**1.  Benjamin Johnson**

On appeal, Johnson challenges the district court's application of the Sentencing Guidelines at the sentencing hearing. He also insists that after he made a Rule 11(d)(2)(B) motion to withdraw his guilty plea, the district court should have held an evidentiary hearing to determine whether his guilty plea was knowing and voluntary.

Johnson, however, waived the right to appeal his sentence in his plea agreement. There is no indication that Johnson's guilty plea was anything but knowing and voluntary. The trial judge addressed Johnson personally to ensure that his plea was knowing and voluntary. The judge ascertained from Johnson that he understood relevant conduct could be used to enhance the length of his sentence and that the maximum term of imprisonment he could face for his count of conviction was twenty years. The trial judge also made sure that Johnson understood he could plead not guilty and receive all the constitutional protections of a fair trial. Thus, Johnson cannot challenge the district court's application of the Sentencing Guidelines.

The government, however, appropriately concedes that the appellate waiver does not apply to the district court's denial of an evidentiary hearing. After entering his guilty plea but before the sentencing hearing, Johnson attempted to withdraw his plea. He claimed that he had been coerced by the government and uninformed about the consequences of a guilty plea. The district judge, finding his Rule 11 colloquy with Johnson to be determinative of these issues, denied the request for an evidentiary hearing.

We review the district court's refusal to allow an evidentiary hearing for an abuse of discretion. *See United States v. Winston*, 34 F.3d 574, 578-79 (7th Cir. 1994). "A hearing on a motion to withdraw a plea is to be routinely granted if the movant offers any substantial evidence that impugns

the validity of the plea." *United States v. Redig*, 27 F.3d 277, 280 (7th Cir. 1994) (quotations omitted). However, "if no such evidence is offered, or if the allegations advanced in support of the motion are mere conclusions or are inherently unreliable, the motion may be denied without a hearing." *Id.* (quotation omitted). Furthermore, the defendant "must overcome the presumption of verity that attaches to [statements made at the Rule 11 colloquy]." *Id.* (quotation omitted).

At his Rule 11 colloquy, Johnson explicitly affirmed that he understood how relevant conduct could be used to increase the length of his sentence. He confirmed that he had discussed this matter with his attorney. He also unequivocally denied that anyone—not his own lawyer, not the government attorneys—had attempted to force him to plead guilty. Johnson's motion to withdraw his guilty plea directly contradicts his statements at the change of plea hearing; his motion lacks any proof for his allegations besides his own self-serving assertions. *See Winston*, 34 F.3d at 578-79 (explaining that affidavits containing only conclusions do not provide a basis for an evidentiary hearing). The district judge was well within his discretion in crediting Johnson's Rule 11 testimony as conclusive. *See United States v. Stewart*, 198 F.3d 984, 987 (7th Cir. 1999).

### 2.   Bobby Davis

Apparently unsatisfied with the result of his plea bargain (twenty years in prison), Davis appeals and asks us to rule, contrary to precedent, that an appeal waiver is either constitutionally invalid or void as against public policy, or, alternately, that his plea agreement was not knowing and voluntary. Along with the appeal, Davis's attorney submitted a request for withdrawal as counsel under *Anders v. California*, 386 U.S. 738 (1967), claiming that no non-frivolous issue was available for appeal.

There is no indication that Davis's guilty plea was anything but knowing and voluntary. As with Johnson, the trial judge addressed Davis personally to ensure that his plea was knowing and voluntary. The judge's inquiries included ascertaining from Davis that he understood that relevant conduct could be used to enhance the length of his sentence, and that the maximum term of imprisonment he could face for his count of conviction was twenty years. The trial judge also made sure that Davis understood that he could plead not guilty and receive all the constitutional protections of a fair trial.

We will not accept Davis's invitation to reevaluate our case law. We find that Davis waived his right to appeal and the only issues presented on appeal are frivolous.

## III.  Conclusion

We AFFIRM the convictions of Bobby Suggs, Seantai Suggs, and Aaron Davis. We AFFIRM Benjamin Johnson's sentence. The motion to withdraw by counsel for Bobby Davis is GRANTED, and Davis's appeal is DISMISSED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*